IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 15, 2020

## STATE OF TENNESSEE v. JOSE GONZALEZ BONILLA

**Appeal from the Criminal Court for Sumner County**
**No. CR323-2016    Dee David Gay, Judge**

_____

### No. M2019-01193-CCA-R3-CD
_____

The Defendant, Jose Gonzalez Bonilla, was convicted by a jury of rape of a child and aggravated sexual battery, and he received an effective sentence of thirty-five years in confinement. The Defendant appeals, asserting that the evidence was insufficient to support the verdict, that the trial court erred in denying his motion to sever, that the trial court erred in permitting the testimony of a forensic social worker, that he is entitled to relief from the convictions under the theory of cumulative error, and that the trial court erred in sentencing him. After a thorough review of the record, we conclude that the Defendant is not entitled to appellate relief, and we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

David Allen Doyle, District Public Defender, and Mike Anderson, Assistant Public Defender, for the appellant, Jose Gonzalez Bonilla.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Ray Whitley, District Attorney General; and Tara Wyllie and Daniel R. Daugherty, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

The Defendant's ten-year-old stepdaughter disclosed to her mother that the Defendant had sexually abused her by digitally penetrating her on one occasion and by

touching her vaginal area on another occasion. The Defendant fled the state but was subsequently apprehended and charged with rape of a child occurring in October 2015 and with aggravated sexual battery occurring in November 2015. The Defendant moved to sever the offenses.

At trial, the victim testified that the Defendant was her stepfather and the father of her younger brother. The victim recalled that when she was ten years old, she lived with her mother, her brother, and the Defendant at the home of her mother's friend for approximately two months. Her family slept in the living room, but she slept in the homeowner's office.

A video of the victim's forensic interview was played for the jury. The victim stated in the video that her mother's friend had a sectional couch in the living room and that her mother was asleep on one end of the couch while the victim was watching television at the other end. She told the interviewer that the Defendant was seated at her mother's feet and began to tug on the victim's leg. The Defendant then put his right hand up the right leg of the victim's loose-fitting pajama pants. She stated that he put his hand into her private area and asked her "if it felt good." She told him to stop and eventually kicked him. At trial, the victim testified that the Defendant's middle finger penetrated her vagina during this episode. She stated on cross-examination that her mother did not wake up.

The aggravated sexual battery took place at a mobile home into which the family moved in November of 2015. In the video, the victim stated that the family was painting the mobile home and that she was standing on the edge of the bathtub to try to reach the ceiling to paint it. The Defendant came in and began to rub her sides and then unbuttoned her skinny jeans, under which she had on shorts. He rubbed the top part of her "area." The victim pushed the Defendant away, and he left. Her mother and brother were painting in the living room.

At trial, the victim stated that the Defendant had rubbed her vagina with his hand on her skin during this episode. She explained that she was wearing shorts under her jeans because she wanted to have shorts for physical education but it was too cold to wear shorts outside. She stated on cross examination that she was standing on the rim of the bathtub, which was approximately three inches wide, and that she did not have trouble balancing.

The victim did not initially tell her mother about the abuse. She stated that she had told her mother "something" prior to the disclosure in the hospital but that her mother did not believe her. The victim had left information out of the prior disclosure. She was

reluctant to disclose because the Defendant had also threatened to hurt her and anyone she told.

In January 2016, the victim's mother was in the hospital because of an intestinal rupture. The whole family was in the hospital room when the victim decided to tell her mother about the abuse. The victim testified that she had worried that if she disclosed the abuse, her mother would attack the Defendant and suffer consequences. She chose to tell her mother at the hospital because she did not believe her mother could hurt the Defendant there. The Defendant fled the room when the victim revealed the abuse. The victim's mother immediately arranged to be discharged and went to find the Defendant but was unsuccessful. The victim's mother then took the victim to another hospital and subsequently to the child advocacy center where the interview was conducted.

The victim stated that she had been close to the Defendant and thought of him as a father figure. She testified that she now "shut everybody out" and that the abuse had affected her relationship with her mother and brother. The victim testified that her mother was the primary parent to discipline the children but acknowledged that the Defendant also occasionally disciplined her.

Ms. Jennifer Longmire testified that she had conducted the victim's forensic interview at Ashley's Place, and she detailed her qualifications and those of the advocacy center.

The victim's mother testified that she and the Defendant married when the victim was approximately thirteen months old and that he was the victim's only father figure. The victim's mother had a son with the Defendant who was approximately a year younger than the victim. The Defendant "walked out" on the family in August 2015. In September, the victim's mother and the children moved in with Ms. Elizabeth Vechey and Ms. Vechey's roommate. In October, the Defendant "started coming around again," and he would spend the night and spend weekends with the family. The victim's mother recalled one night in October 2015 when she was on the couch with the victim and Defendant watching movies and fell asleep. The victim's mother confirmed that the family subsequently moved to a mobile home in November, where they painted the walls.

On January 10, 2016, the victim's mother had been in the hospital for four days, and her children and the Defendant were visiting her. The victim made a disclosure, which caused the victim's mother to get out of bed, remove her intravenous equipment, and "in anger go after" the Defendant. The Defendant reacted "like a deer that was caught in headlights," began to yell, and stormed out. The victim's mother insisted that she be discharged against medical advice and began to drive to a children's hospital, but she stopped at a different hospital after speaking with her niece on the telephone. She

reported the victim's allegations to police and took the victim to Ashley's Place, the Sumner County Child Advocacy Center. She later took the victim for a medical examination at Our Kids in Nashville.

The victim's mother became aware that the Defendant had left the state, but she maintained contact with him in an attempt to obtain a confession. The victim's mother placed a recorded telephone call to the Defendant with the assistance of the Gallatin Police Department, and this recording was played for the jury. During this telephone call, the Defendant denied digitally penetrating the victim but acknowledged, "Maybe she feel like I was. I did touch her…. I don't know what the f*** I was thinking…" The Defendant stated he had apologized to the victim, but he also blamed the victim by claiming, "At that moment, she let me do whatever I was doing." The Defendant denied having touched the victim inappropriately in the bathroom, "at least not intentionally." He asserted that he "didn't for real put [his] hands in there" but put a finger on the back and front of the victim's pants to pull them up. The Defendant made other incriminating statements, including that he did not know what "c[a]me across" him, that he did not see how he could face the victim's mother "after what [he had] done," and that he did not have the courage to "go back to the house and say ok and act like nothing happened." When asked if what he had done to the victim was motivated by something the victim's mother had done to him, the Defendant replied, "For a moment … I was thinking of revenge for all the stuff you done for me, on me." The victim's mother asked him if he had taken something she did "out on [her] child," and he confirmed, "I guess that is what I was thinking."

The victim's mother testified that the victim was "bubbly" and friendly prior to the assaults but that she had attempted suicide three times since and that she was cutting herself. The victim was also taking "her anger and the rage out on her brother" because he resembled the Defendant.

The victim's mother acknowledged that the victim only disclosed one sexual assault in the hospital. She testified that the Defendant did not live at Ms. Vechey's house and that if the victim said he did, the victim might have been confused because of the frequency of the Defendant's visits. She acknowledged that the Defendant occasionally disciplined the victim and that the victim would get upset. She agreed that she had never witnessed any inappropriate contact between the victim and the Defendant.

Ms. Elizabeth Vechey confirmed that she housed the victim's mother and the two children for two to three months. The Defendant did not live there but visited one to two nights per week and on the weekends. She confirmed that the victim's mother and brother slept in the living room, noting there was a sectional couch which would accommodate two adults, in addition to an air mattress. The victim occasionally slept in

the office. Ms. Vechey did not witness anything inappropriate, and the family moved out after Thanksgiving.

In January 2016, Investigator James Myers was employed as an investigator with the Gallatin Police Department, and he was assigned to investigate the case. He made an appointment for the victim at Ashley's Place and observed the interview. Investigator Myers spoke briefly with the Defendant, and the Defendant said he had done nothing and did not intend to return to the state. Investigator Myers was able to record a telephone call between the victim's mother and the Defendant on January 28, 2016. On March 15, 2016, the Defendant had been apprehended and returned to the State, and Investigator Myers interviewed him. In the interview, the Defendant acknowledged that he "messed up." Asked to elaborate, he stated, "I, I mean, I touch her in a couple. I was in there on the couch, my wife was over here she was on the other side…. I touch her on the thigh or whatever." He asserted he did not have intercourse with the victim and that he had apologized to her because he was "not supposed to be doing that." He stated that in the bathroom, he had only been pulling up the victim's pants, which were falling down. Investigator Myers agreed that English was not the Defendant's first language, and he could not recall whether he had offered the Defendant the services of an interpreter.

The Defendant objected at trial to the proposed testimony of Ms. Jill Howlett, who was a forensic social worker at Our Kids, an outpatient clinic which conducts medical examinations of children when there is suspicion of sexual abuse. The Defendant asserted that Ms. Howlett's testimony about the victim's statements constituted inadmissible hearsay, and the State argued that the statements were medical history taken for the purposes of medical diagnosis. The court ruled that Ms. Howlett could testify about the victim's statements but not about the victim's mother's statements. The court also excluded a statement the victim made to Ms. Howlett that the Defendant had once choked her when she threatened to tell about the abuse.

Ms. Howlett testified that as a forensic social worker, she would first obtain information from a child's parent or guardian, and then, if the child was over five years old, she would meet with the child in order to obtain the child's medical history. She stated that the medical history she would obtain from a child was for the purpose of medical diagnosis and treatment. She noted that she spoke to the child in part to evaluate the child's mental and physical development. Ms. Howlett would immediately share the medical history she had obtained from the child with the nurse practitioner, who would then conduct a medical examination of the child. Ms. Howlett spoke with the victim to obtain her medical history on January 25, 2016, asking the victim about prior injuries, whether she had started her period, and whether she was experiencing pain during urination or defecation. She also asked the victim if she knew what the private areas of her body were and if anyone had ever touched them. The victim stated that her stepfather

had touched her private area, "[t]he one I go pee from," with his hand on the inside. She only disclosed one incident to Ms. Howlett. The victim said that the Defendant threatened to "smack her" if she told anyone and that she revealed the abuse to her mother while her mother was in the hospital because she did not believe the Defendant would hurt her there. She stated that she had not suffered any other sexual abuse. Ms. Howlett stated that it was not unusual for a child to delay the disclosure of abuse and that only a small fraction of the children seen at the center were examined within seventy-two hours of an assault.

Ms. Hollye Gallion, clinical director and pediatric nurse practitioner at Our Kids, testified regarding the report of the victim's physical examination. The examination showed no sign of injury or infection. Ms. Gallion testified that she would not have expected to see any physical evidence of assault based on the victim's allegations. She stated that only about seven percent of children presented with injuries when there were allegations of sexual abuse and that injuries were more likely if a child reported an assault within hours, if a child described penetration, or if a child was over twelve or thirteen years old. She stated that for children under twelve or thirteen, only two or three percent would present with medical findings, and the percentage would be lower if the alleged sexual contact had happened weeks prior to the examination. Ms. Gallion acknowledged that she was not the nurse who had performed the victim's exam and that the physical findings were consistent with the absence of sexual abuse. She stated that the physical findings were also consistent with sexual abuse.

The jury convicted the Defendant of rape of a child and aggravated sexual battery. At the sentencing hearing, the victim's mother reiterated that the victim had attempted suicide and had been cutting herself. Both of her children questioned whether they could still love the Defendant. The victim had difficulty trusting people, blamed her mother and brother, and feared that her brother would someday sexually abuse a child. The victim's mother asked for the maximum punishment, noting that the Defendant had hurt a child he had known since infancy. She and the Defendant had since divorced. In response to the court's questions, she stated that the Defendant was not legally in the country and that he had obtained information on becoming a citizen at the time of their marriage but had not become a citizen. Prior to the victim's disclosure, the Defendant had contributed to the household expenses, and the victim had confided in him about her schooling and social life. The Defendant showed an interest in the victim and was a good father prior to the abuse. He had expressed remorse for his crime, but during their last telephone call, he had expressed disbelief at his convictions rather than empathy for the victim. She acknowledged that she permitted the Defendant's son to speak with him and that she had also at times spoken with the Defendant.

- 6 -

The victim confirmed that she had attempted suicide and cut herself. She said that she felt she was "hateful" toward her family and friends and that she feared her brother would turn out like the Defendant. She said she had loved the Defendant like a father, had thought of him as her best friend, and felt he had betrayed her trust. She stated that the Defendant had had some sexual contact with her earlier than the incidents charged in the indictment.

The trial court applied as enhancement that the Defendant had a prior history of criminal behavior because he was not legally in the country. T.C.A. § 40-35-114(1). The trial court found he had committed the rape of a child offense to gratify a desire for pleasure or excitement. T.C.A. § 40-35-114(7). The trial court also found he abused a position of private trust in committing the offenses. T.C.A. § 40-35-114(14). The trial court refused to apply as mitigation that the Defendant's conduct did not cause or threaten to cause serious bodily injury did not apply, observing that the court did not "understand it; why you give credit to somebody['s] sentence because of this." *See* T.C.A. § 40-35-113(1). The trial court applied as mitigation that the Defendant had no prior criminal record. T.C.A. § 40-35-113(13). The trial court found that the offense was particularly serious because of the nature of the Defendant and victim's relationship, noting that the Defendant destroyed his family unit and left his family. The trial court found the Defendant had no potential for rehabilitation, observing that he had refused to make a statement in the presentence report. The trial court sentenced the Defendant to serve thirty-five years for rape of a child and twelve years for aggravated sexual battery, to be served concurrently.

## ANALYSIS

## I. Sufficiency of the Evidence

The Defendant asserts that the evidence was insufficient to support the verdicts because he believes that it is "unlikel[y]" he or the victim could have performed "physical feats" such as the Defendant reaching across his body to put his hand up the victim's pajama pants or the victim balancing on a bathtub during an assault. However, we conclude that the prosecution presented evidence from which a rational trier of fact could have found the elements of the offenses beyond a reasonable doubt.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it

may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a) (2015). Sexual penetration is not limited to intercourse but includes "any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

As charged here, aggravated sexual battery is unlawful sexual contact with a victim by the defendant when the victim is less than thirteen years of age. T.C.A. § 39-13-504(a)(4). Sexual contact includes the intentional touching of the victim's intimate parts or the clothing covering the immediate area of the intimate parts, "if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Intimate parts include "the primary genital area, groin, inner thigh, buttock or breast of a human being." T.C.A. § 39-13-501(2).

The State's proof for the rape of a child charge included the testimony of the victim that the Defendant put his hand up the leg of her pajama pants and that he penetrated her vagina with his finger. Her testimony was corroborated by the Defendant's statements in the telephone call acknowledging that he "did touch her" and that maybe the victim "fe[lt] like" he penetrated her with his finger. He stated that he did not know what "c[a]me across" him, that he did not know what he was thinking, and that he did not feel he could face the family. In the recorded call, the Defendant suggested that he had been seeking revenge against the victim's mother for infidelity. He also acknowledged in his interview with Investigator Myers that he touched the victim on the

couch, stating that his wife was on the couch and he touched the victim "on the thigh or whatever." He maintained that he did not have intercourse with the victim, and he stated he had apologized to her.

The victim also testified that when she was standing on the bathtub to reach the ceiling, the Defendant unbuttoned her skinny jeans and manipulated her gym shorts and underwear in order to rub her vagina. On the recorded telephone call, the Defendant acknowledged putting a finger on the front and back of the ten-year-old victim's pants to pull them up but maintained that he "didn't for real put [his] hands in there." In the police interview, he likewise asserted he was only pulling up her pants. After the victim revealed the abuse, the Defendant fled the hospital room and the state. He told Investigator Myers that he did not intend to return.

We conclude that this evidence is sufficient for a rational trier of fact to find the elements of the charged offenses. The Defendant's argument is essentially a challenge to the jury's credibility determinations, which we will not revisit on appeal. *Smith*, 436 S.W.3d at 764. The Defendant is not entitled to relief.

## II. Severance

The Defendant asserts the trial court erred in considering improper evidence on the severance issue. He also asserts that the trial court erred in denying his motion to sever the two offenses against the victim because the offenses were subject to severance, as they were not part of a common scheme or plan and neither would have been admissible in the trial of the other under Tennessee Rule of Evidence 404(b). We conclude that the State offered sufficient evidence at the hearing to provide a basis for the trial court's ruling. Furthermore, the trial court did not abuse its discretion in denying severance because the Defendant's acts were part of a larger, continuing plan or conspiracy and were relevant to a material issue other than propensity.

At the severance hearing, the State introduced the victim's forensic interview and a recorded telephone call between the victim's mother and the Defendant. The Defendant objected to the forensic interview on hearsay grounds and objected to the prosecutor's request that the court to listen to the recorded material in chambers rather than playing the recordings in open court. The prosecutor noted that the forensic interviewer was present at the severance hearing and could testify to satisfy the statutory requirements pertinent to the advocacy clinic and the interview prior to the admission of the forensic recording. However, defense counsel stated that even if the strictures of the statute were satisfied, the defense believed that the forensic interview would only be admissible at trial and not at the hearing. The trial court stated that it would consider the two recordings in chambers, it noted that the defense would have access to the recordings in

order to know what had been put before the court, and the hearing was continued. When the hearing resumed, the recorded telephone call between the Defendant and the victim's mother was played in court.

The Defendant argued that the two offenses were not subject to mandatory joinder and that he was entitled to severance under the principles of permissive joinder. The State argued that the offenses were subject to mandatory joinder. The trial court ruled that the principles of permissive joinder applied but that the offenses were part of a larger, continuing plan or conspiracy because they had a common goal or purpose, which was "borne out in the phone call." The court found that evidence of one would be admissible in the trial of the other to establish motive, intent, or lack of mistake, and it concluded that the probative value of the evidence was not outweighed by undue prejudice. The trial court denied the motion to sever the offenses.

## A. Proof at Severance Hearing

The Defendant objects to the trial court's consideration of the recordings of the controlled telephone call between the Defendant and the victim's mother and to the video recording of the forensic interview. A trial court considering a severance issue should conduct a hearing to determine if the requirements of Tennessee Rule of Criminal Procedure 14(b)(1) have been met. *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008). "[B]y holding a hearing and issuing findings of fact and conclusions of law, a trial court ensures that, on review, the appellate courts will have an adequate record from which to determine whether the trial court erred upon an allegation that it improperly consolidated offenses." *State v. Garrett*, 331 S.W.3d 392, 403 (Tenn. 2011). The trial court's conclusions regarding severance must be drawn "from the evidence and argument presented at the hearing." *Dotson*, 254 S.W.3d at 387. A motion regarding severance or consolidation is normally heard prior to trial, and "evidence and arguments tending to establish or negate the propriety of consolidation must be presented to the trial court in the hearing on the motion." *Spicer v. State*, 12 S.W.3d 438, 445 (Tenn. 2000). Accordingly, "appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses." *Id.* However, the Tennessee Supreme Court has considered evidence adduced at trial in reviewing a severance determination when the trial court failed to hold an adequate hearing. *Garrett*, 331 S.W.3d at 404; *State v. Toliver*, 117 S.W.3d 216, 228 n.4 (Tenn. 2003) (concluding that, when the severance issue was only addressed in a "shortened" hearing on the morning of trial, appellate review would "necessarily require[] review of the evidence at trial"); *compare Spicer*, 12 S.W.3d at 447 (concluding that in the context of an open-dated indictment, the State could not meet its burden to consolidate "with evidence later developed at trial" and that the appellate court would not consider such evidence or the

effect of a later election but that "the state must bring forth sufficient evidence at the hearing to establish that specific acts constitute parts of a common scheme or plan").

At the severance hearing, the State sought to introduce the recording of the controlled call between the Defendant and the victim's mother. The Defendant objected not to the telephone call itself but to the trial court's decision to review it in chambers. The recording of the controlled telephone call was ultimately played in court during the second day of the hearing. The Defendant cites to no authority for the proposition that this was improper. We conclude that any objection to the consideration of the controlled call is waived. Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Accordingly, the trial court properly considered the recorded telephone call as evidence. We note that, in finding that the offenses constituted a larger, continuing plan or conspiracy, the trial court relied only on evidence "that was borne out in the phone call." The Defendant's admissions of wrongdoing, his statement that he committed the acts as revenge, and his assertion that the victim was mistaken about the nature of the touching were all contained in the recorded telephone call.

Regarding the forensic interview, the Defendant agreed that the interview would be admissible at trial if the statutory requirements were met but objected on a hearsay basis to its consideration at the severance hearing. The prosecution noted that Ms. Longmire was at the hearing and could testify regarding whether the video met the statutory requirements of Tennessee Code Annotated section 24-7-123. However, Ms. Longmire was not called, because the Defendant stated that his objection was not to whether the statutory requirements were met but was a hearsay objection to the admissibility of the video under any conditions during a hearing on a motion to sever.

A statement that is offered in evidence to prove the truth of the matter asserted and that is not made by the declarant while testifying at the trial or hearing constitutes hearsay. Tenn. R. Evid. 801(c). Hearsay is not admissible except as provided by the Rules of Evidence or otherwise by law. Tenn. R. Evid. 802. While an appellate court defers to a trial court's findings of fact or credibility determinations regarding hearsay, we review de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015).

We observe that the bulk of the evidentiary relevance of the forensic interview did not relate to the truth of the matters asserted therein. In deciding the motion to sever, the trial court was not called upon to determine the truth of the victim's accusations in the video. The trial court was instead called upon to determine what allegations were leveled against the Defendant and whether the alleged crimes constituted part of a larger,

continuing plan or conspiracy. For the purposes of severance, the video was evidence not of the fact that the Defendant committed rape of a child and aggravated sexual battery but of the fact that the State possessed evidence which would show two separate crimes committed on the same victim at different times and locations. In other words, even if the trial court had found the victim's assertions not credible, the video would have been relevant to establish that the Defendant was accused of having digitally penetrated the victim at one address and accused of having fondled the victim about one month later at a different address. The circumstances of the accusations were relevant to determine whether there was a larger, continuing plan or conspiracy and whether any of the alleged offenses would be relevant to a material issue other than propensity.

In any event, "the Tennessee Rules of Evidence generally do not apply in hearings to determine the admissibility of evidence." *State v. Bonds*, 502 S.W.3d 118, 138 (Tenn. Crim. App. 2016) (concluding that hearsay testimony regarding identification at a suppression hearing was properly admitted) (citing Tenn. R. Evid. 104(a)). Under Tennessee Rule of Evidence 104(a), preliminary questions regarding the admissibility of evidence must be determined by the trial court, but the trial court "is not bound by the rules of evidence except those with respect to privileges." Tenn. R. Evid. 104(a). As part of the severance determination, the trial court was called upon to determine whether the evidence of one offense would be admissible in the trial of the other offense under Tennessee Rule of Evidence 404(b). *See Garrett*, 331 S.W.3d at 402 ("As we have pointed out previously, Tennessee Rule of Evidence 404(b) is called into play when a trial court must decide whether proof of a defendant's alleged misconduct on one occasion may be admitted in conjunction with proving his alleged misconduct on a separate occasion."); *Dotson*, 254 S.W.3d at 387. We conclude that the trial court did not err in considering the evidence presented by the State during the severance hearing. The Defendant's contention that the trial court's determinations were based on improper evidence is without merit.

### B. Severance

The Defendant asserts that the trial court erred in denying his motion for a severance, arguing that the offenses were not part of a common scheme or plan and that the trial court erred in its analysis under Tennessee Rule of Evidence 404(b). The State responds that the trial court did not err in its conclusion and that any error would be harmless. We conclude that the offenses were part of a common scheme or plan to seek revenge against the victim's mother and that the trial court did not err in its analysis under Tennessee Rule of Evidence 404(b). The Defendant is not entitled to relief.

We agree with the parties that this issue is properly analyzed under the principles of permissive joinder. A trial court's decisions regarding permissive joinder under

Tennessee Rule of Criminal Procedure 8(b) or severance pursuant to Tennessee Rule of Criminal Procedure 14(b)(1) are reviewed for abuse of discretion. *Spicer*, 12 S.W.3d at 442 (citing *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). The court abuses its discretion when it court applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that caused an injustice to the party complaining. *Id.* at 442-43. The trial court may exercise its discretion only "when the offenses are parts of a common scheme or plan *and* when the offense sought to be severed would be admissible as evidence in the trial of the other offenses." *Shirley*, 6 S.W.3d at 247. Failing to consider the relevant factors also constitutes an abuse of discretion. *Garrett*, 331 S.W.3d at 401.

Tennessee Rule of Criminal Procedure 8(b) governs permissive joinder:

(b) **Permissive Joinder of Offenses.** Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if:

(1) the offenses constitute parts of a common scheme or plan; or

(2) they are of the same or similar character.

In a case of permissive joinder, the defendant may nevertheless be entitled to a severance under Tennessee Rule of Criminal Procedure 14(b)(1):

(1) …. If two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others.

Even where offenses have properly been consolidated under Rule 8(b), the defendant is still entitled to a severance unless the requirements of Rule 14(b)(1) are met. *Garrett*, 331 S.W.3d at 402. Accordingly, a defendant "has an absolute right to have offenses separately tried unless the prosecution shows that the offenses are part of a common scheme or plan *and* evidence of each crime would be admissible in the trial of the others." *Toliver*, 117 S.W.3d at 228.

In ruling on a severance motion, the trial court must consider the evidence and arguments presented at the hearing and determine whether: (1) the offenses constitute parts of a common scheme or plan; (2) evidence of one of the offenses is relevant to a material issue in the trial of the other offenses; and (3) the probative value of the proof regarding the other offenses is not outweighed by the prejudicial effect of the admission

of the evidence. *Dotson*, 254 S.W.3d at 387. "[T]he 'primary issue' to be considered in any severance case is whether evidence of one offense would be admissible in the trial of the other if the two offenses remained severed." *Spicer*, 12 S.W.3d at 444 (citing *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984)). "In its most basic sense, therefore, any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Id.* (quoting *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)). The Tennessee Supreme Court has observed that admission of other crimes carries an inherent risk that the jury will consider the prior crime as propensity evidence. *Dotson,* 254 S.W.3d at 387. "Accordingly, any doubt about the propriety of the consolidation of similar offenses over a defendant's objection should be resolved in favor of the defendant." *Garrett*, 331 S.W.3d at 403.

### 1. Common Scheme or Plan

The phrase "common scheme or plan" has the same meaning as the same phrase "for evidentiary purposes." *Moore*, 6 S.W.3d at 240 n.7. Offenses forming part of a common scheme or plan fall into one of three categories: "(1) offenses that reveal a distinctive design or are so similar as to constitute 'signature' crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction." *Shirley*, 6 S.W.3d at 248 (citing Neil P. Cohen et al., *Tennessee Law of Evidence* § 404.11, at 180 (3d ed. 1995)). In this case, the offenses are neither signature crimes nor part of the same criminal transaction, but the trial court found they were part of a larger, continuing plan or conspiracy. When offenses are alleged to be part of a larger, continuing plan or conspiracy, the prosecution must present proof of "'a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial.'" *State v. Prentice*, 113 S.W.3d 326, 331 (Tenn. Crim. App. 2001) (quoting *State v. Hoyt*, 928 S.W.2d 935, 943 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447 n.12).

"[A] larger, continuing plan or conspiracy 'involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed.'" *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting *Hoyt*, 928 S.W.2d at 943); *see State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). The offenses may not be simply a string of similar crimes, but must be committed "in furtherance of a plan that has a readily distinguishable goal." *Denton*, 149 S.W.3d at 15. In other words, the plan must operate towards the future "'with such force as to make probable the crime for which the defendant is on trial.'" *Prentice*, 113 S.W.3d at 331 (Tenn. Crim. App. 2001) (quoting *Hoyt*, 928 S.W.2d at 943). A shared motivation for two otherwise unrelated crimes is not sufficient, but "[e]ach of the consolidated offenses must serve to further the goal or plan in existence at the time of the commission of the first offenses." *State v. Timothy Leron*

*Brown*, No. M2017-00904-CCA-R3-CD, 2019 WL 1514551, at *28 (Tenn. Crim. App. Apr. 8, 2019), *perm. app. denied* (Tenn. Aug. 15, 2019).

The mere fact that multiple crimes were committed for the purpose of sexual gratification does not serve to make them part of a larger, continuing plan or conspiracy for the purposes of joinder. *Denton*, 149 S.W.3d at 15 (concluding that a medical provider's sexual offenses were not part of continuing plan or conspiracy based only on the fact that they were committed for sexual gratification); *Moore*, 6 S.W.3d at 240 (analyzing under the signature crimes theory, but also noting that separate rapes of the defendant's stepdaughter occurring months apart in different circumstances were not properly part of a larger conspiracy); *Burchfield*, 664 S.W.2d at 288 (offenses committed more than ten years apart against two victims were not part of a common scheme or plan); *Hallock*, 875 S.W.2d at 289-90 (defendant's sexual abuse of minor children in his household was not part of a common scheme or plan merely because it was for the purpose of sexual gratification).

On the other hand, sexual offenses evincing a plan or conspiracy may be joined for trial under Rule 14(b)(1). *State v. Osborne*, 251 S.W.3d 1, 12-13 (Tenn. Crim. App. 2007) (the defendant's sexual offenses against his daughter and another minor victim were part of a common scheme or plan when he used his daughter's friendship with the other victim and his status as the victim's babysitter to commit the offenses); *State v. Thomas D. Stricklin*, No. M2005-02911-CCA-R3-CD, 2007 WL 1028535, at *11 (Tenn. Crim. App. Apr. 5, 2007) (the defendant's sexual offenses against two victims were part of a larger, continuing plan or conspiracy when he told police he was attempting to educate the victims on sexual matters); *State v. David Boyd Conner, Jr.*, No. M2005-01628-CCA-R3-CD, 2006 WL 3516215, at *5 (Tenn. Crim. App. Dec. 5, 2006) (multiple offenses against single victim were part of a continuing plan); *State v. Morris*, 788 S.W.2d 820, 823 (Tenn. Crim. App. 1990) (the defendant's sexual offenses were part of a common scheme or plan to molest the victims when they were committed against members of a tumbling group over a period of years and he used his position of respect in the community to select his victims and to entice them by offering them recognition in the tumbling group); *see Craig U. Quevedo v. State*, No. M2010-01399-CCA-R3-PC, 2013 WL 1188957, at *12 (Tenn. Crim. App. Mar. 22, 2013) (concluding on post-conviction that a severance issue was not meritorious because the petitioner's journal indicated a continuing plan to attempt penetrate the victim and to isolate her in order to continue to subject her to sexual abuse); *State v. Marcos Enrique Collazo, Sr.*, No. M2009-02319-CCA-R3-CD, 2011 WL 4529643, at *11 (Tenn. Crim. App. Sept. 29, 2011) (sexual abuse of two nieces was part of a common scheme or plan when the defendant told the victims he had magic powers and convinced them that only sexual contact would alleviate his pain).

Here, the Defendant made incriminating statements in the recorded telephone conversation with the victim's mother. At one point, he told the victim's mother that he had touched the victim as "revenge" for the things that the victim's mother had done to him, and they discussed men she had seen while he was "away." The victim's mother asked, "So everything that I [did] to you, you took it out on my child…?" The Defendant confirmed, "I guess that is what I was thinking." We conclude that this evidence is enough to establish a larger, continuing plan or conspiracy to enact revenge on the victim's mother by sexually abusing the victim. Accordingly, the trial court did not err in finding that the two offenses were part of a common scheme or plan.

## 2. Admissibility of One Offense in Trial of Other

The trial court has the discretion to deny severance only when the offenses are both part of a common scheme or plan and "when the offense sought to be severed would be admissible as evidence in the trial of the other offenses." *Shirley*, 6 S.W.3d at 247. In order to meet the admissibility requirement of the second prong of admissibility under Rule 14(b)(1), the trial court must conclude first that "the evidence of each offense is relevant to some material issue in the trial of the other offense under Tennessee Rule of Evidence 404(b)(2)," and it must also find that "the probative value of the evidence of the other offense is not outweighed by the prejudicial consequences of admission under Tennessee Rule of Evidence 404(b)(4)." *Osborne*, 251 S.W.3d at 12.

Accordingly, we must decide whether evidence of one of the offenses is relevant to some material issue in the trial of the other offense. *See Dotson*, 254 S.W.3d at 387. Tennessee Rule of Evidence 404(b) excludes evidence of "other crimes, wrongs, or acts" when offered only to show the defendant's propensity to commit those "crimes, wrongs, or acts." Evidence of other crimes is admissible to show: "(1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident; or (6) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other." *Osborne*, 251 S.W.3d at 12. In the recorded telephone call, the Defendant acknowledged touching the victim but told the victim's mother that he did not digitally penetrate her, although "[m]aybe she feel like I was." Regarding the aggravated sexual battery, the Defendant stated he "didn't really didn't put [his] hands in" the victim's pants but instead put a finger on the back and front of the victim's pants to pull them up. Accordingly, the Defendant's statements allege that the victim was mistaken about the nature of the touching that was the basis for the offenses and that he did not intend to touch the victim sexually. He also stated he was thinking of revenge during the touching. The admission of the evidence of other crimes, then, was relevant to establish motive and intent and to rebut a defense of accident or mistake. The trial court did not err in concluding that the prior wrongs were admissible under Tennessee Rule of Evidence 404(b). *Thomas D. Stricklin*, 2007 WL 1028535, at

- 16 -

*11 (the offenses against separate victims were relevant to show motive, intent, and lack of accident or mistake when the defendant stated that he was attempting to impart sexual education and either touched the victims inadvertently or only touched them by "tapping" them).

Neither did the trial court abuse its discretion in determining that the probative value of the evidence was not outweighed by the prejudicial effect. The proof on the two offenses was not only substantially similar but almost entirely overlapping. The offenses were committed against one victim, who testified as to both offenses, and the Defendant's statements to police and to the victim's mother acknowledged having touched the victim on both occasions but denied penetrating her on the couch or touching her sexually in the bathroom. The Defendant made general admissions that he made a mistake, did not know what he had been thinking, was sorry, and was afraid to face the family, and these general admissions were not specific to one particular offense. Accordingly, the strength of the proof on both counts was approximately the same, and the same proof would have been admissible at both trials. We conclude that the trial court did not abuse its discretion in concluding the probative value was not outweighed by the prejudicial effect. *State v. Jeremy Randall C. Ledbetter*, No. M2018-00846-CCA-R3-CD, 2020 WL 853733, at *20 (Tenn. Crim. App. Feb. 20, 2020) (concluding that "single victim and strong probative value of the other acts evidence" limited the concern for unfair prejudice).

Because the Defendant's statements support the conclusion that the offenses were part of a larger, continuing plan or conspiracy to enact revenge on the victim's mother, because proof of each offense was relevant to motive, intent, and absence of accident or mistake, and because the trial court did not err in balancing the probative and prejudicial value, we conclude that the trial court did not abuse its discretion in denying the motion to sever.

### III. Forensic Social Worker's Testimony

The Defendant also asserts that the testimony of Ms. Howlett, the forensic social worker who spoke with the victim prior to her medical examination at Our Kids, constituted inadmissible hearsay. We conclude that the trial court properly found that the statements were admissible because they were made for the purposes of medical diagnosis and treatment.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. A trial court's findings of fact or credibility determinations underlying a decision to admit or exclude

- 17 -

hearsay are binding on an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Id.* We review for abuse of discretion the determination to exclude otherwise admissible hearsay based on relevance or on a balancing of probative value and prejudice under Tennessee Rule of Evidence 403. *Id.*

One exception to hearsay is "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." Tenn. R. Evid. 803(4). The rationale behind making such statements admissible is that such a statement is "'presumptively trustworthy because a patient is strongly motivated to speak the truth in order to receive proper diagnosis and treatment'" and because a statement deemed sufficiently reliable to form the basis of diagnosis and treatment "'is also sufficiently reliable for consideration by a court of law.'" *State v. Spratt*, 31 S.W.3d 587, 600 (Tenn. Crim. App. 2000) (quoting *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997)). The statement does not necessarily have to be made to the treating physician, so long as it is made for the purposes of diagnosis and treatment. *Id.* at 600-01. The fact that the declarant is a child does not undermine the hearsay exception, although the court should consider "all the circumstances of a child's statement because the child's ability to articulate the reason for the statement may be affected by age or developmental maturity." *Stinnett*, 958 S.W.2d at 332. "A statement improperly influenced by another, one made in response to suggestive or leading questions, or inspired by a custody battle or family feud deserves especially careful scrutiny because such statement may have been made for purposes other than diagnosis and treatment." *Id.*

Ms. Howlett testified that she obtained a medical history from the victim and that this medical history was for the purposes of medical diagnosis and treatment. She elaborated that she would ask a child for medical history in part for the purpose of evaluating a child's mental and physical development. Ms. Howlett asked the victim about prior injuries, whether she had started her period, and whether she was experiencing pain during urination or defecation. She also asked the victim if she knew what the private areas of her body were and if anyone had ever touched them. The victim told Ms. Howlett that her stepfather had touched her private area, "[t]he one I go pee from," with his hand on the inside. She only disclosed one incident to Ms. Howlett. The victim said that the Defendant threatened to "smack her" if she told anyone and that she told her mother in the hospital because she did not believe the Defendant would hurt her there. Ms. Howlett shared the medical history she had obtained from the victim with the nurse practitioner immediately prior to the nurse practitioner's medical examination of the victim.

- 18 -

We conclude that the trial court properly admitted the victim's statements that the Defendant had had sexual contact with her. The victim was ten years old — "old enough to understand that the physician was examining her to determine whether there was injury or trauma and to treat her for such, if necessary." *Stinnett*, 958 S.W.2d at 332. There is no evidence that the victim had any motivation to be untruthful with medical personnel. *See id.* The Defendant asserts it was improper for Ms. Howlett to ask the victim about whether she had ever been subjected to inappropriate touching, arguing that such a question demonstrates that the victim's statements were not made for the purpose of medical diagnosis and treatment. While Ms. Howlett testified that the victim's statements were made in response to a question asking the victim to identify her private body parts and asking whether anyone had touched her private parts, she also testified the information was part of the victim's medical history which was used to guide the subsequent physical examination. We note parenthetically that the statements admitted through Ms. Howlett were largely cumulative of the victim's trial testimony. We conclude that the trial court did not err in admitting the testimony.

## IV. Cumulative Trial Errors

The Defendant also asserts that he is entitled to relief from his convictions under a theory of cumulative error. The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Reversal for cumulative error functions to protect the defendant's constitutional right to a fair trial, but such reversals are rare. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). The doctrine of cumulative error only applies when there has been more than one error committed during trial. *Hester*, 324 S.W.3d at 77. Because we have concluded that the evidence was sufficient to support the verdicts, that the motion to sever was not denied in error, and that Ms. Howlett's testimony was admissible, the Defendant is not entitled to relief under a theory of cumulative error.

## V. Sentencing

The Defendant also asserts that the trial court erred in sentencing him because it improperly elicited evidence regarding his immigration status, considered his immigration status in evaluating his history of criminal behavior, considered his refusal to make a statement in the presentence report, and refused to apply the mitigating factor that the Defendant's conduct neither caused nor threatened to cause serious bodily injury. The State responds that the trial court properly applied enhancement factors, that the

sentence fell within the appropriate range, and that the trial court did not abuse its discretion.

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining. *Herron*, 461 S.W.3d at 904. The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or enhancement factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The trial court is "to be guided by — but not bound by — any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party bears the burden of proving that the sentence was improper. *Carter*, 254 S.W.3d at 344.

In determining "the specific sentence and the appropriate combination of sentencing alternatives," the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. T.C.A. § 40-35-210(b).

The trial court should impose a sentence which is "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1). The sentencing laws are intended "to assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." T.C.A. § 40-35-102(2). "Sentencing should exclude all

considerations respecting race, gender, creed, religion, national origin and social status of the individual." T.C.A. § 40-35-102(4). Inequalities in sentencing that are unrelated to a purpose of the sentencing act should be avoided. T.C.A. § 40-35-103(3). The sentence should be "the least severe measure necessary to achieve the purposes for which the sentence is imposed" and it should "be no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2), (4). The trial court should consider the defendant's potential or lack of potential for rehabilitation. T.C.A. § 40-35-103(5).

At sentencing, the victim and her mother both testified regarding the profound impact the abuse had on their family. The victim noted that the Defendant had been her father-figure and best friend and that she was experiencing trouble in her ability to trust and in her personal relationships. The trial court questioned the victim's mother about the Defendant's immigration status, which had been the subject of some redacted statements in the Defendant's interview with Investigator Myers. The court asked what the Defendant's "citizenship status" was, and the victim's mother answered, "He is illegal." She stated that when they were married, an attorney had informed the Defendant "on what steps needed to be done" but that the Defendant did not follow through.

The trial court recited that it was considering the proof adduced at trial, testimony from the sentencing hearing, the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct involved, the arguments of counsel, and mitigating and enhancements factors. The trial court particularly noted it had considered the "attitude" of the Defendant, his refusal to make a statement, and his potential for rehabilitation.

The court applied as enhancement that the Defendant had a prior history of criminal behavior because he was not legally in the country. *See* T.C.A. § 40-35-114(1). The trial court found he had committed the rape of a child offense to gratify a desire for pleasure or excitement. *See* T.C.A. § 40-35-114(7). The trial court also found he abused a position of private trust in committing the offenses. *See* T.C.A. § 40-35-114(14). The trial judge refused to apply the mitigating factor that the Defendant's conduct did not cause or threaten to cause serious bodily injury, observing he did not understand the factor or "why you give credit to somebody['s] sentence because of this." *See* T.C.A. § 40-35-113(1). The court applied as mitigation that the Defendant had no prior criminal record. *See* T.C.A. § 40-35-113(13).

In looking at whether the sentence was justly deserved in relation to the seriousness of the offense, the trial court found that the offense was particularly serious because of the nature of the Defendant and victim's relationship. The trial court noted the impact on the victim. The trial court found the Defendant had no potential for rehabilitation, noting that he had refused to make a statement in the presentence report.

The court found he had shown no remorse and had not asked for forgiveness. The trial court sentenced the Defendant to serve thirty-five years for rape of a child and twelve years for aggravated sexual battery, to be served concurrently.

The parties agree that the Defendant's sentences of thirty-five and twelve years fall within the appropriate ranges. The Defendant nevertheless asserts various errors. First, he contends that the trial court improperly elicited evidence regarding his immigration status. The Defendant cites to no authority for the proposition that it was improper for the court to ask the State's witnesses questions, and we are aware of none. Instead, Tennessee Code Annotated section 40-35-209(b) provides that the rules of evidence generally apply in a sentencing hearing. Tennessee Rule of Evidence 614(b) permits a court to interrogate witnesses. Accordingly, "[s]o long as the inquiry is impartial, trial courts may ask questions to either clarify a point or to supply any omission." *State v. Schiefelbein*, 230 S.W.3d 88, 118 (Tenn. Crim. App. 2007). The trial court had previously redacted information in the police interview tending to show that the Defendant had been deported and was not legally residing in the country. Accordingly, we do not think the trial court erred in inquiring about the Defendant's immigration status.

In response to the court's question, the victim's mother stated that the Defendant was "illegal," presumably meaning that he had not immigrated to the United States in compliance with United States law. She stated that the Defendant had consulted a lawyer after they were married but that he had not rectified his immigration status. The trial court apparently credited this testimony. The Defendant contends that the trial court improperly considered his immigration status in enhancing his sentence based on a prior history of criminal behavior. Evidence that a defendant entered this country in violation of immigration laws constitutes evidence of prior criminal behavior. *State v. Guadalupe Arroyo, Alias*, No. E2002-00639-CCA-R3-CD, 2003 WL 1563209, at *3 (Tenn. Crim. App. Mar. 27, 2003) (concluding that entering the country illegally, drinking underage, and driving without a license all constituted prior criminal behavior under enhancement factor (1)). Although the Defendant argues that there is not enough evidence to support the trial court's finding, "facts relevant to sentencing need be established only 'by a preponderance of the evidence and not beyond a reasonable doubt.'" *State v. Cooper*, 336 S.W.3d 522, 524 (Tenn. 2011) (quoting *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000)). We conclude that the trial court did not err in applying this factor.

The Defendant next contends that the trial court erred in considering his refusal to make a statement in the presentence report. The State responds that the trial court's observation was merely a comment on the Defendant's lack of remorse. The trial court, in listing the statutory considerations for sentencing, stated that it had considered "[t]he statement the Defendant made, and in this particular case, his refusal to make any

statement." The trial court again later noted that the Defendant had refused to make a statement, concluding that this reflected on his potential for rehabilitation: "the Defendant has shown absolutely no potential for rehabilitation, you refuse to speak, or answer questions, no expression of remorse, no asking for forgiveness, no admitting wrong, these are factors that are very considerable in sentencing the Defendant."

The Defendant cites to *Mitchell v. United States*, for the proposition that he retained a right against self-incrimination during sentencing. 526 U.S. 314, 327-28 (1999). In *Mitchell*, the United States Supreme Court concluded that the proposition that no negative inference is permissible from a defendant's refusal to testify extends to "the sentencing phase of a criminal case with regard to factual determinations respecting the circumstances and details of the crime." *Id.* at 328. The Court noted, however, that "[w]hether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment [pursuant to the sentencing guidelines], is a separate question." *Id.* at 330. We conclude that the trial court's consideration of the Defendant's refusal to make a statement did not concern "factual determinations respecting the circumstances and details of the crime." *Id.* at 328. Instead, the trial court appears to have considered the Defendant's refusal in light of his potential for rehabilitation and remorse. We conclude that the Defendant's right against self-incrimination was not violated. *See United States v. Kennedy*, 499 F.3d 547, 551 (6th Cir. 2007) (concluding that it was within the court's discretion to consider the defendant's refusal to take a psychosexual examination when selecting a sentence).

The Defendant asserts that the trial court erroneously refused to apply the mitigating factor that the Defendant's conduct neither caused nor threatened to cause serious bodily injury. The Defendant cites to *State v. Hayes*, 899 S.W.2d 175, 187 (Tenn. Crim. App. 1995), in which this court determined that the mitigating factor applied to a conviction for aggravated sexual battery. The trial court appears to have rejected this factor on the basis that the judge did not understand the factor or "why you give credit to somebody['s] sentence because of this." A trial court is required to consider evidence and information offered on mitigating factors. T.C.A. § 40-35-210(b)(5). "The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." T.C.A. § 40-35-210(c)(2). We conclude that the trial court erred in rejecting this statutory factor on the basis that the trial court did not "understand" the factor or agree with the principle behind mitigating a sentence based on this factor. While a trial court is not required to assign any particular weight to any of the enhancement or mitigating factors and while the court is not required to either reduce or increase a sentence based on the presence of any enhancement or mitigating factor, the statute clearly requires the court to consider those mitigating factors listed in 40-35-113. We caution the trial court in the future to adhere to the statutory requirements in considering enhancement and mitigating factors.

- 23 -

Nevertheless, we conclude that the trial court did not abuse its discretion in determining the length of the sentence. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or enhancement factors." *Carter*, 254 S.W.3d at 346. The Tennessee Supreme Court has observed that "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. In *Bise*, the trial court misapplied the single enhancement factor supporting the sentence. *Id.* at 708. The sentence was nevertheless upheld because the trial court had based the decision on its determination of the need for deterrence and other considerations in keeping with the purposes and principles of sentencing. *Id.* at 708-09.

A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id.* at 706. Here, the trial court properly applied as enhancement the Defendant's prior history of criminal behavior and the Defendant's abuse of a position of private trust. The trial court gave particular weight to the fact that the Defendant had been a father-figure to the victim since her infancy, that they had a close relationship, and that his actions destroyed his family. The sentence fell within the appropriate statutory range. We conclude that the trial court did not wholly depart from the purposes and principles of sentencing in enhancing the Defendant's sentence based on the enhancement factors it applied.

## CONCLUSION

Based on the foregoing, we affirm the trial court's judgments.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE